# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

FILED
AUG 30 2012
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

## CRIMINAL COMPLAINT

UNITED STATES OF AMERICA

v.

Raymond Arthur Gentile and
Gustavo Angel Salinas

CASE NUMBER: 5:12-mj-00044 JLT

(If search warrant is issued regarding this complaint, indicate above the case number assigned.)

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. Beginning at a time unknown but no later than on or about June 28, 2009, and continuing to on or about June 28, 2012, in Kern County, in the Eastern District of California, and elsewhere, the defendant(s) did,

Knowingly and intentionally conspire to manufacture, to distribute, and/or to possess with intent to distribute 100 or more marijuana plants and/or 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, and methamphetamine, a Schedule II controlled substance,

in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and 846, with a mandatory minimum penalty of 5 years in prison and a maximum penalty of 40 years in prison and a maximum fine of $5 million.

I further state that I am a(n) **Special Agent for the Drug Enforcement Administration** and that this complaint is based on the following facts: *(Official Title)*

SEE ATTACHED AFFIDAVIT, attached hereto and incorporated herein by reference.

Continued on the attached sheet and made a part hereof:   **X**  Yes  _____ No

_Signature of Complainant_
Christopher M. Grimm, Special Agent
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

8/30/12
(Date)                                         (City and State)             at   Bakersfield, California

Jennifer L. Thurston, U.S. Magistrate Judge
(Name & Title of Judicial Officer)              (Signature of Judicial Officer)

## **AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS**

I, Christopher M. Grimm, being duly sworn, hereby state and depose:

### A. **Affiant's Credentials.**

1. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in Title 18 U.S.C. § 2516. I am, and have been, a Special Agent of the United States Department of Justice, Drug Enforcement Administration (DEA) since January, 2011. I attended basic agent training at the Justice Training Center, Quantico, Virginia. During training, I received more than 300 hours of training in drug use and physiology, methods of manufacture, importation, transportation, distribution, and sales of controlled substances. In January, 2011, I was assigned to the DEA Bakersfield Resident Office (BRO). Prior to my employment with DEA, I was employed by the St. Louis County Police Department from January, 2004, to September, 2010.

2. During my career, I have conducted or participated in controlled substance investigations, including investigations of conspiracies involving controlled substances (21 U.S.C. §§ 841(a)(1) and 846) and the manufacture, distribution, and possession of controlled substances with the intent to distribute (21 U.S.C. § 841(a)(1)). These investigations targeted large scale drug trafficking organizations engaged in the manufacture, importation, and distribution of marijuana, methamphetamine, heroin, cocaine, and other controlled substances. During the course of my work, I have had the opportunity to converse with numerous law enforcement officers, informants, as well as admitted and known drug traffickers as to the methods, regarding the manufacture, importation, transportation, and distribution of controlled substances and the methods used to conceal, transport, and launder cash and/or other types of drug proceeds. I have become knowledgeable in the methods used by drug traffickers to import, conceal,

1

transport, distribute, and manufacture sell controlled substances, as well as their methods used to conceal, transport, and launder cash and/or other types of drug proceeds. I have been the affiant on federal and state affidavits, and have testified both in state and federal court in the area of narcotics.

I.

## NATURE OF AFFIDAVIT

3. This affidavit is submitted to support a complaint charging Raymond Arthur Gentile, 51 (referred to herein as "Gentile") and Gustavo Angel Salinas, 24 (referred to herein as "Salinas"), with knowingly and intentionally conspiring to manufacture, to distribute and/or to possess with intent to distribute marijuana, a Schedule I controlled substance, and methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. This affidavit does not purport to contain all the facts related to this investigation, but only those facts necessary to establish probable cause with respect to the aforementioned offense.

II.

## STATEMENT OF PROBABLE CAUSE

### Background Information

4. On May 8, 2012, Bakersfield Police Department Officers William Westbrook and Marc Aguilar received a call at approximately 1:43 a.m. for a report of an assault with a deadly weapon. Officer Westbrook contacted the victim.

5. The victim stated that on May 5, 2012, he and a friend went to purchase marijuana at ANP Collective, Inc. located at 1218 Baker Street in Bakersfield. I have determined that ANP Collective, Inc., is identified as such on business records for the establishment at 1218 Baker Street and is also identified as ANP Cooperative, Inc., in Bakersfield City business license and other public documents. ANP Collective or Cooperative shall be referred to herein as the "Subject Premises."

2

6. The victim stated that upon arriving he contacted the "bud tender," a Hispanic male in his 20's, later identified as Gustavo Angel Salinas. The victim stated that during the purchase Salinas accused him of attempting to steal marijuana from the Subject Premises. The victim stated that he did not want to engage in a dispute and agreed to pay Salinas for the amount he was accused of stealing. The victim further stated that he completed the sale and travelled home. After arriving home, he weighed the marijuana on a scale and discovered that the Salinas had incorrectly weighed the bag.

7. The victim stated that he returned to the Subject Premises on May 7, 2012, to discuss the misunderstanding with the owner, Gentile. The victim stated that a friend drove him to the Subject Premises. The victim stated that he arrived at approximately 4:00 p.m. and entered the store alone while his friend waited in the car. The victim stated that, upon entering, he contacted Gentile, who directed him to a room located to the rear of the Subject Premises. The victim stated that he entered the room first and that Gentile then hit him on the bicep of his right arm with a smaller aluminum baseball bat to get his attention. The victim stated that Gentile did not strike him very hard with the bat. When the victim turned around, Gentile was holding a dark grey semi-automatic handgun in his hands.

8. In a follow-up interview, the victim informed Bakersfield Police Detective (Det.) Donald Cegielski that Gentile racked the slide on the hand gun. The victim also informed Det. Cegielski that Gentile took the victim's cellphone away from him. The victim stated that Gentile pointed the weapon at him and stated, "I should fucking shoot you for coming back into my store after stealing from me." According to the victim, Gentile further stated, "Don't even talk, you worthless piece of shit." The victim stated that Gentile made several other threats to include, "I should beat you to death and leave you in the alley. I'm going to cut off your hand. I'm going to drown you." The victim stated that Gentile told him he was going to call some friends and have them "take care of him." Gentile

further informed the victim that he was going to call the police and have them arrest him for stealing. The victim stated the he was held in the store for approximately one hour.

9. According to the victim, during this time, he heard someone knock on the front door and also heard Gentile tell the person at the door to leave and that they were "closed." The victim stated that Gentile then turned off the open light sign in the front window. The victim said that at this time Gentile spoke to an unknown female "bud tender" who was present and asked her to check the surveillance video on May 5, 2012, to see if the victim was stealing from the business. The victim stated that shortly after this Gentile walked into the room and told him, "It's Christmas for you. It's your lucky day. Go home." At this time, the victim left the Subject Premises.

10. Bakersfield Police Department Officers Westbrook and Aguilar then contacted the victim's friend, who stated that he had driven the victim to the Subject Premises on May 7, 2012. The victim's friend stated that he and the victim arrived at approximately 4:00 p.m. and that the victim entered the storefront while he waited in the car. The victim stated that about one hour later at approximately 5:00 p.m. he attempted to enter into the Subject Premises to look for the victim and was met by Gentile who informed him the collective was closed and then turned off the "open" light sign.

11. Officer Westbrook then conducted a record check of Gentile, which indicated that Gentile's home address was 1218 Baker Street, the same address as the Subject Premises. Officer Westbrook also obtained a driver's license photograph of Gentile which was shown to the victim, who confirmed that it was a photo of "Ray," who was the man who had held him against his will.

12. On May 18, 2012, Det. Cegielski contacted Salinas via telephone and asked if he was available to speak to him. Salinas stated that they could meet at 2225 Nelson St., #B, in Bakersfield. During the interview, Salinas stated that on May 5, 2012, he was working at the ANP Collective and that Gentile was working in the front office of the

4

business. Salinas stated that when a customer would enter into the business Gentile would greet them in the front foyer and make sure that they were a member in good standing. After membership was confirmed, Gentile would lead the customer to the dispensary area where the customer would be sold marijuana. Salinas stated that on May 5, 2012, the victim and another individual came into the collective and proceeded to the dispensary area. Salinas stated that the victim wanted two different types of marijuana from the collective. Salinas stated that he placed 1.5 grams of "Grand Daddy Purple" in a zip lock bag provided by the collective and placed the bag on the counter. Salinas stated that while he retrieved an additional 1.5 grams of "AF Goo" marijuana he observed the other individual with the victim pick up the bag of "Grand Daddy Purple" marijuana and replace it with an empty bag provided from the ANP Collective. Salinas stated that when the other individual switched bags he turned his back to a security camera located on the west wall that records the dispensary area. Salinas stated that he confronted both the victim and the other individual about attempting to steal the marijuana; both the victim and the other individual denied stealing the marijuana. Salinas stated that the victim then paid him $35 for a total of 3.0 grams of marijuana. Salinas informed Det. Cegielski that the price for a gram of marijuana that day was $10.

13. Salinas informed Det. Cegielski that two days later the victim returned to the collective in the afternoon hours. Salinas stated that the victim informed him that two days prior Salinas had made a mistake and placed the entire 3.0 grams of marijuana into one zip lock bag, and not separate bags. Salinas informed Det. Cegielski that after the victim entered the collective Salinas closed and locked the front door. Salinas stated that he directed the victim into the dispensary room along with Gentile. Salinas stated that Gentile approached the victim and informed him that he had caught him stealing and that he was no longer allowed in the collective. Salinas stated that the victim was "held" in the dispensary room for approximately 30 minutes and then was allowed to leave.

Det. Cegielski asked Salinas what he meant by "held." Salinas indicated the victim was free to leave. Det. Cegielski asked Salinas if any threats were made. Salinas replied in the negative. Salinas also stated that Gentile did not "pull a gun" on anyone. Salinas stated that the victim was in possession of a cellular phone while in the dispensary room and that it continued to go off. Salinas stated that the victim was asked to place the phone on the counter for the duration of the time in the back room. Det. Cegielski asked Salinas what the purpose of detaining the victim was. Salinas stated that they were going to try and scare him. Salinas stated that they informed the victim that they were going to call the police. Det. Cegielski asked Salinas if anyone knocked on the front door of the collective while the victim, Gentile, and Salinas were located in the back. Salinas replied in the negative. Salinas stated that after approximately 30 minutes the victim was released and that Gentile told him before leaving, "Merry Christmas."

14. Det. Cegielski then asked Salinas if there was a bat kept in the business. Salinas replied, "Yes," and indicated it was located in the front office under the counter by a trash can. Salinas also stated that Gentile possessed a gun, which he kept in the employee area of the business. Salinas stated he did not know where the gun was located on May 7, 2012. Salinas also informed Det. Cegielski that he had not observed the video surveillance footage from either May 5, 2012, or May 7, 2012.

15. On May 16, 2012, Det. Cegielski met with the victim. The victim described again the incident of May 7, 2012, that he had earlier reported to Officers Westbrook and Aguilar. Det. Cegielski asked the victim if he knew where the weapon had been before Gentile produced it. The victim responded that he did not. He also said that Gentile lives at the Subject Premises. The victim stated that one side of the building is the collective and the other is the private residence of Gentile.

16. On May 18, 2012, Det. Cegielski conducted a record check which indicated that, in connection with the purchase of two firearms from Second Amendment Sports,

Gentile indicated his address was 4703 Chinta Drive in Bakersfield.   Det. Cegielski proceeded to this address and met with another person by another name who informed him that he did not know any Raymond Gentile and that he had purchased the property approximately nine months ago.   Det. Cegielski then proceeded to the Subject Premises. Detectives Cegielski and Marcela Garcia contacted a V. Kalena Nikkol Joyner at the front door and identified themselves and asked if Gentile was present.

17.   Gentile met with the detectives in the front room of the business. Det. Cegielski informed Gentile that he needed to speak with him about the incident that took place at the collective involving the victim. Gentile asked Det. Cegielski if he needed an attorney present before he spoke with Det. Cegielski.   Det. Cegielski replied that it was Gentile's decision. Gentile then agreed to speak to the detectives without his attorney present.

18.   Gentile then directed the detectives to the dispensary room located on the south side of the building, where the "medicine" is dispensed to patients, according to Gentile.   Gentile stated that on an unknown date the victim and another individual, arrived at the collective and attempted to purchase marijuana from a "bud tender," Gustavo Salinas, also known as "Gus."   Gentile stated Salinas informed him that the victim and the other individual had attempted to steal marijuana from the dispensary. Gentile stated that the victim then returned several days later to the collective to speak with Gentile. Gentile stated that he followed Salinas and the victim to the dispensary room where he told the victim that he did not like the games he was playing and that he was going to call the police. Gentile stated that he picked up the phone but did not call anyone; he further stated that he told the victim to sit on the floor in the northwest corner of the room. Det. Cegielski asked Gentile if he had made any threats. Gentile replied that he told the victim that he should kick his ass for what he did. Gentile informed Det. Cegielski that he made no other threats to the victim and that the victim was held in the dispensary room for approximately 10 to 15 minutes. Det. Cegielski asked Gentile if the victim was free to

7

leave the room. Gentile responded that the victim never asked to leave. Gentile informed Det. Cegielski that he did take the victim's phone, because he was worried that the victim would try and contact his friends for help. Gentile also stated that the victim's friend did knock at the front door knocking and that Gentile told him that the collective was temporarily closed.

19. Det. Cegielski then asked Gentile if there were any firearms located on the Subject Premises. Gentile stated that there was a shotgun in the other room. Det. Cegielski also asked Gentile if he had any pistols. Gentile stated that he did. Gentile then directed Detectives Cegielski and Garcia to a small living area on the Subject Premises that was equipped with a bed and bathroom. Gentile pointed to a shotgun leaning against the wall near the bed and then lifted sheets from the bed revealing a .45 caliber Glock handgun. Det. Cegielski cleared both weapons and observed that neither had a round in the chamber. Det. Cegielski asked Gentile if he normally kept his hand gun loaded in this manner to which he replied yes. Gentile then directed Det. Cegielski to the front office area and removed from a small cabinet an aluminum bat that was labeled "Tire Thumper." Gentile stated that the bat was there for the protection of the female "bud tenders." Det. Cegielski seized both the bat and the Glock handgun as evidence.

20. During the investigation, Det. Cegielski observed a video camera located on the west wall of the dispensary room. Det. Cegielski asked Gentile whether both incidents at been captured by the camera. Gentile stated yes. Det. Cegielski then asked if he could observe the footage of the incidents in question. Gentile replied he would not show the footage to the detectives without first consulting his attorney but indicated that he would turn over the footage after he had done so. Gentile also advised Det. Cegielski that he had recently been having problems with PG&E and the footage may have been lost.

21. On May 18, 2012, Detectives Cegielski and Garcia spoke with "Bud tender" V. Kalena Nikkol Joyner who was present on May 7, 2012. Det. Cegielski asked Joyner if

8

she recalled the content of any conversation she had with Gentile on May 7, 2012, while the victim was at the collective. Joyner stated that she recalled having a conversation with Gentile but could not remember the content. Joyner also stated that she could not describe the victim's demeanor when he was in the dispensary room with Gentile and Salinas. Joyner also stated that she did not observe any weapons in the room that day and did not know whether Gentile owned any. She also stated she did not know whether there was a bat located in the collective and did not know what time she had come into work that day.

22. On May 21, 2012, Det. Cegielski attempted to obtain the video footage of the incident from Gentile who did not return his calls. On May 22, 2012, Det. Cegielski contacted the victim, who responded to the Bakersfield Police Department. Det. Cegielski showed the victim three photo lineups and the victim identified Gentile as the individual who had pointed the gun at him and who is the owner and operator of the collective. The victim also positively identified Salinas as the "bud tender" who was present on both May 5, 2012, and May 7, 2012. The victim identified a Department of Motor Vehicles photograph of V. Kalena Nikkol as the female who was present on May 7, 2012 and who had spoken to Gentile immediately before the victim's release.

23. On May 24, 2012, Det. Cegielski and detectives of the Bakersfield Police Department went to the ANP Collective at 1218 Baker Street to execute a state search warrant that was signed on May 23, 2012, by the Honorable Judge J. Brownlee. Upon arrival, Det. Cegielski observed that the doorbell for the collective had been removed, along with other display items that had previously been located in the window. Det. Cegielski attempted to call the collective's phone number, but there was no answer. The search warrant was not executed at this time. Det. Cegielski conducted a Kern County Property check of the business, which revealed that the real property for the collective is owned by a Marian Poloynis Survivors Trust with a billing address of 5446 Nagle Avenue,

Sherman Oaks California, 91401. ANP Collective Inc. had a listed billing address of P.O. Box 3545, Bakersfield, California, 93385.

24. On June 25, 2012, I conducted a record check of the incorporation information for ANP Collective, which revealed that Raymond A. Gentile is listed as the Chief Executive Officer, President, and Corporation Agent of Service.

25. On June 26, 2012, I spoke with Det. Cegielski about his observations at the collective. Det. Cegielski stated that while walking down the hallway from the foyer to the dispensary room there were several interior doors that were closed and had security screen doors located on them. Det. Cegielski stated that from the hallway he could hear the running of electrical equipment. Det. Cegielski also stated that once inside Gentile's living space he observed what he believed to be a 30 gallon clear plastic trash bag that contained dry marijuana that appeared to be in the process of having the buds removed. Det. Cegielski also observed several pounds of dried marijuana in jars located in the dispensary room along with several clear cases of what appeared to be marijuana edibles. Det. Cegielski stated that based on his training, experience, and conversations with other law enforcement officers he believed that there was an indoor marijuana grow located at the collective based on the humming sound of electrical equipment that he heard emanating from the closed rooms.  Det. Cegielski has been employed by the Bakersfield Police Department for twenty years.  He has six years of experience as a detective with five years assigned to narcotics investigations.  He has specialized knowledge and has received training in marijuana investigations, including, but not limited to, the investigation of indoor marijuana cultivation grows.  He has also been the affiant for search warrants in investigations of suspects involved in the cultivation of marijuana. In addition, he has previously participated in the investigation of suspects in involved in the cultivation of marijuana. The humming sound was consistent with the sound of fans or air conditioners commonly used at indoor marijuana cultivation sounds to lower the high

10

temperatures typically generated by the high energy electrical lighting required for cultivation of the plants.

26. On June 26, 2012, I travelled to 1218 Baker Street and conducted surveillance. During surveillance, I observed several people coming in and out of the collective's front door. I also saw people leaving the Subject Premises carrying items. I also observed that there were six cars parked in spots that were designated for ANP Collective and located directly to the north of the building. I observed that parking poles in front of each spot had been painted the same color green as the awning and poles located on the structure at 1218 Baker Street. It appeared that ANP Collective was back in business.

27. On June 27, 2012, I again conducted surveillance of 1218 Baker Street and observed several people enter into the Subject Premises. Prior to entering, each individual pressed a doorbell directly to the right of the front door and then wait. Salinas opened the front door for each individual that I saw enter the Subject Premises and directed them into the Subject Premises. This activity was consistent with the statements made by Salinas to Det. Cegielski regarding how he admits members into the collective in order to dispense marijuana to them.

## Execution of Federal Search Warrant

28. On June 28, 2012, agents from the Bakersfield DEA Resident Office, Detectives of the Bakersfield Police Department and I executed a federal search and seizure warrant at the Subject Premises. During the search, I located Gentile, who informed agents that he was living in a bedroom located in the Subject Premises.

29. Gentile was placed under arrest for an outstanding state arrest warrant relating to the May 7, 2012, incident described herein: witness intimidation (California Penal Code § 136.1(b)(1)), false imprisonment with violence (California Penal Code § 236), assaulting a person with a semi-automatic firearm (California Penal Code § 245(b)), and threatening a crime with intent to terrorize (California Penal Code § 422).

30. At a separate location, on June 28, 2012, at approximately 7:50 a.m., officers of the Bakersfield Police Department also arrested Salinas on an outstanding state warrant for similar charges relating to the May 7, 2012, incident described herein.

31. Following his arrest, I advised Gentile of his Miranda rights and he indicated that he understood those rights. I further advised Gentile that he could have an attorney present during any questioning. Gentile stated, "I have nothing to hide." Gentile then proceeded to tell me that approximately three years ago he and his brother Michael Gentile incorporated ANP, a marijuana cooperative. Gentile stated that he is the manager of the cooperative and is also responsible for cultivating, budding, and growing the marijuana that was located on the premises. Gentile also stated that he uses marijuana. Gentile stated that, as he understood California law, cooperatives should be self-sufficient, and that it was his goal to grow all of the marijuana that was eventually distributed to members. I asked if the cooperative was self-sufficient in the way that Gentile described. Gentile responded that he has several vendors that he contacts when his supply is low and purchases anywhere from three to five pounds of marijuana from these vendors for approximately $2,500 to $3,000 a pound. I then asked Gentile who had access to two safes located on the premises. Gentile stated that both safes were under his complete control. He stated that he was the only individual with the combinations to the safes. Gentile stated that he stores marijuana and money from the cooperative in the safes. I asked Gentile about a shotgun that was located near his bed and near one of the safes. Gentile stated that the shotgun was there to protect him and employees from attempted burglaries and robberies.

32. Agents also found during the search of the Subject Premises two rooms dedicated to cultivating marijuana. Both rooms had large grow lights, marijuana plants at different stages of growth, shelving, exhaust systems, humidifiers, and numerous fans. I observed that each of the grow rooms had numerous fans hanging from the ceilings and

placed on shelves, these fans    Adjacent to these rooms was a space that was dedicated to drying marijuana on PVC racks.  I asked Gentile who, if anyone, tends the plants and removes the buds after drying.  Gentile stated that typically after the cooperative closes he works on tending and cultivating the marijuana.

33.  During the search of the Subject Premises, agents discovered the following controlled substances: approximately 170 marijuana plants, approximately 25.1 pounds of processed marijuana, approximately 1,831 suspected hydrocodone pills, approximately 735 suspected morphine pills, approximately 59 suspected Naproxen pills, approximately 30.39 gross grams of a substance which I believe based on my training and experience to be methamphetamine, 112.39 gross grams of suspected kief (the resin glands of cannabis), 177 suspected Seroquel pills, and 140 pills of different colors and types with no identifiable markings.  Agents also recovered a 12 gauge shotgun that was leaning on a wall approximately 8 feet from the bedroom utilized by Gentile and approximately 6 feet from a Liberty Safe that contained processed marijuana, prescription pills, and U.S. currency.  Agents seized approximately $68,173.30 in U.S. currency from two separate safes.  These safes were both located in the employee area and near the bedroom used by Gentile, as well as the room utilized for drying the marijuana.

34.  On July 3, 2012, I Grimm contacted the Fifth District Court of Iron County in the State of Utah regarding case number 991500632.  According to court documents provided to me, on October 6, 1999, GETNILE pled guilty to the charge of Cultivation of Marijuana, a felony.  Also include among the documents was a, "STATEMENT OF DEFENDANT REGARDING PLEA BARGAIN CERTIFICATE OF COUNSEL AND ORDER."  This document was initialed in 16 places and signed by Gentile as well as his attorney, Gilbert D. Athay, and was dated October 6, 1999.  The final document provided was an "ORDER REDUCING DEGREE OF CONVICTION," signed October 24, 2001, in which Judge Robert T. Braithwaite ordered that Gentile's probation be terminated and his

13

conviction be reduced to a Class A misdemeanor.

35. On July 12, 2012, Special Agent Sherri Reynolds of the Bureau of Alcohol Tobacco, Firearms, and Explosives (ATF) contacted me. SA Reynolds had conducted a record check on two of the weapons that had been recovered from the ANP Collective. The first, a Mossberg shotgun, was recovered during the federal search warrant. The record check revealed that the shotgun had been purchased by Raymond A. Gentile on December 12, 2008, and that he had provided his social security card and driver's license as identification at the time of purchase. The second firearm was a Glock that was seized by Bakersfield Police Department Detective Cegielski. The record check of this handgun revealed that it was purchased on March 9, 2012, by Raymond A. Gentile and that he provided his California driver's license as identification to 2nd Amendment Sports located on Mohawk Street in Bakersfield, CA 93308.

36. On July 12, 2012, I served a subpoena to Second Amendment Sports, the vendor of firearms purchased by Gentile, referenced above. In response to the subpoena, Second Amendment Sports provided me with copies of the Firearms Transaction Record, ATF Form 4473, which Raymond A. Gentile filled out and signed for two Glock handguns that he purchased from the store. On each of the forms, Gentile certified under penalty of federal and state prosecution for false statements that his home address was 4703 Chinta Drive in Bakersfield, CA 93313, whereas, in truth and in fact, as set forth above, he did not reside at that location at the time of the purchase of the firearms. In fact, he was residing at the Subject Premises, the location of his marijuana store. Gentile also certified on each form that he does not use marijuana, contrary to his post-arrest statement and prior marijuana conviction. In addition to the forms, Second Amendment Sports provided a copy of Raymond Gentile's driver's license, registration, and Handgun Safety Certificate (number 547093) that they require all purchasers to provide at the time of sale. Following the filing of assault charges relating to the May 7

14

incident described herein, the second Glock handgun that Gentile had purchased from Second Amendment Sports was placed on hold and was never released to Gentile.

### III.
### CONCLUSION

37. Based on the foregoing, I believe there is probable cause to believe that Raymond Arthur Gentile and Gustavo Angel Salinas knowingly and intentionally conspired to manufacture, to distribute, and/or to possess with intent to distribute 100 or more marijuana plants and/or 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, and methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

Your affiant swears that the facts presented are true and accurate to the best of my knowledge.

Christopher M. Grimm
Special Agent
Drug Enforcement Administration

SWORN AND SUBSCRIBED TO BEFORE ME
THIS 30th DAY OF AUGUST, 2012

JENNIFER THURSTON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF CALIFORNIA

Reviewed and Approved as to form and content this 30th day of August, 2012:

/s/ Karen A. Escobar
Karen A. Escobar
Assistant United States Attorney